STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
COUNTY OF WATAUGA      FILE NO. 2022-CvS- 599.

| | |
|---|---|
| Eric Karchmer | § § |
| Petitioner-Plaintiff | § **PETITION FOR JUDICIAL REVIEW** |
| Vs. | § **AND COMPLAINT** |
| | § |
| Appalachian State University and Sheri Everts, Chancellor of Appalachian State University in her official capacity. | § § § § |
| Defendants. | § § § |

Plaintiff complaining of Defendants alleges as follows:

## THE PARTIES

1.      Plaintiff is a resident of Ashe County, North Carolina and was an Assistant Professor in the Anthropology Department at Appalachian State University.

2.      Defendant Appalachian State University is a body corporate and politic of the State of North Carolina and its principal place of business is located in Watauga County, North Carolina and can be sued in its own name.

3.      Defendant Sheri Everts is the Chancellor of Appalachian State University.

## ALLEGATIONS SUPPORTING CLAIMS

4.      Plaintiff was a tenure track assistant professor in the Department of Anthropology at Appalachian State University for the academic calendar years 2013-2021.

5.  In the fall of 2019, Plaintiff followed all procedures in requesting promotion and tenure. At this time, Dr. Tim Smith was chair of the Anthropology Department, Dr. Neva Specht was the dean of the College of Arts and Sciences, and Dr. Sheri Everts was chancellor at Appalachian State University. In February 2020, Dr. Heather Norris was appointed interim provost, one month before she made decisions on all the 2019 applications for promotion and tenure.

6.  In accordance with the rules and customary practices of Appalachian State University, the Department of Anthropology formed a Promotion and Tenure Committee comprised of five tenured professors in the Department of Anthropology and tasked them with evaluating Plaintiff's application for promotion and tenure.

7.  Shortly before the department's Promotion and Tenure Committee was scheduled to make its final assessment of Plaintiff's application, Chair Smith made a false allegation of academic fraud against Plaintiff to Dean Specht with regards to how Plaintiff represented the status of his in-progress book manuscript in his promotion and tenure application.

8.  Dean Specht did not follow the required procedures of Appalachian State University with respect to allegations of academic fraud against faculty members [ Exhibit "A" (Faculty Handbook 3.6)]. Instead, she directed Chair Smith to arrange a meeting with Plaintiff and Chair Smith. Dean Specht did not inform Plaintiff of the reason for the meeting in advance, nor did she afford him the opportunity to bring a witness. During the meeting, Dean Specht accused Plaintiff of academic fraud and secretly recorded the meeting.

9.  After a thorough review of Plaintiff's teaching, scholarship and service to Appalachian State University, which included external review by three specialists in Plaintiff's field, the Anthropology Department's Promotion and Tenure Committee unanimously recommended Plaintiff's promotion and tenure. Prior to the vote, Plaintiff spoke directly to the Committee, as permitted by the Faculty Handbook, to clarify the status of his in-progress book manuscript, the academic work about which the false charge of academic fraud had been made by Chair Smith.

10. Chair Smith delivered the unanimous recommendation of the department's Promotion and Tenure Committee to Dean Specht. In his attached memo, he went to great lengths to disparage Plaintiff with false, misleading and inaccurate statements about his teaching, scholarship and service as an assistant professor. He also further elaborated on the false charge of academic fraud. When this memo was later reviewed by the Faculty Grievance Hearing Committee, a neutral body of faculty members assembled to hear university grievance cases, it was determined to be evidence of Chair Smith's personal malice towards Plaintiff. The Appalachian State University Faculty Handbook and University of North Carolina Code forbids all participants in the promotion and tenure application process from acting on the basis of personal malice. [Exhibit "B" Appalachian State University Faculty Handbook 3.7.3 and University of North Carolina Code 101.3.1.2 [R] II.B]

11. Chair Smith was well aware of the prohibitions against personal malice in the promotion and tenure process. In his memo to Dean Specht, he attempted to hide his personal malice by including one sentence at both the opening and closing in purported support of Plaintiff's

application for promotion and tenure. The remainder of the 10-page memo, however, contained only extensive argumentation against Plaintiff's application.

12. In her review of Plaintiff's promotion and tenure application, Dean Specht disregarded the evaluations of the Department's Promotion and Tenure Committee and external reviewers. Instead, she relied entirely on Chair Smith's memo to recommend against Plaintiff's promotion and tenure. She highlighted the false accusation of academic fraud as a key rationale for her decision.

13. Dean Specht's recommendation was marred by multiple "material procedural errors," a violation of the Faculty Handbook of Appalachian State University and University of North Carolina Code. One, she accused Plaintiff of having committed academic fraud without providing the neutral forum for investigating this charge as guaranteed in Faculty Handbook 3.6. Two, she relied on the prejudicial views of Chair Smith in justifying her decision, making his personal malice the basis of her decision. She made no reference to the very supportive evaluations of the Promotion and Tenure Committee and external reviewers. Three, as evidence later revealed during the grievance process, she had already decided to reject Plaintiff's application before it had even been reviewed by the Anthropology Department's Promotion and Tenure Committee or officially transmitted to the Dean's office for her review.

14. Based on Dean Specht's recommendation, Provost Norris denied Plaintiff's application for promotion and tenure. The decision triggered the notification to Plaintiff that he would not be re-appointed to his position at Appalachian State University in 2021.

15. Following the Provost's decision, Plaintiff challenged the University's decision through the grievance procedures laid out in the Appalachian State University Faculty Handbook and University of North Carolina Code. During this process, Plaintiff asked Provost Norris to open an inquiry into the charges of academic fraud that had been the basis of Dean Specht's recommendation and Provost Norris' decision. The Provost refused to open an inquiry. This action constituted a denial of due process, since it made it impossible for Plaintiff to undo the reputational harm already inflicted by the false accusation. At the same time, it allowed the damage from the original charge of academic fraud to continue to influence administrative review of Plaintiff's application for promotion and tenure.

16. Plaintiff appealed the denial of his application for promotion and tenure to the Faculty Grievance Hearing Committee and named Dean Specht and Chair Smith as respondents. The Faculty Grievance Hearing Committee heard approximately 13 hours of testimony, examined 30 documents submitted by the respondents (including the transcript of the meeting secretly recorded by Dean Specht) and 67 documents submitted by Plaintiff, reviewed 528 pages of hearing transcript, and wrote a meticulous 17-page report. The Committee found (i) Chair Smith had acted out of personal malice, an impermissible action according to the Appalachian State University Faculty Handbook and University of North Carolina Code, in recommending against and otherwise undermining Plaintiff's application for promotion and tenure; and (ii) Dean Specht had committed material procedural errors in handling Plaintiff's application to the extent that it "cast substantial doubt upon the validity of the ... decision." (Faculty Handbook 4.11.3.2) Based on its review of the transcript of the secretly recorded meeting by Dean Specht, which she had

submitted as evidence, the Committee found that she had pre-determined her decision on Plaintiff's promotion and tenure application.

17. The Faculty Grievance Hearing Committee recommended to the Chancellor that Appalachian State University either award Plaintiff promotion and tenure or allow Plaintiff to re-apply without Chair Smith and Dean Specht participating in the process.

18. At the grievance hearing, neither Dean Specht nor Chair Smith testified or submitted to cross-examination by the grievant or the Committee. But both the Dean and Chair inserted "testimony" into their closing statements, where it could not be challenged. Dean Specht also used her cross-examination of Plaintiff's witnesses as an opportunity to make additional claims about Plaintiff. Both actions constituted a denial of due process since Plaintiff had no opportunity for cross-examination.

19. The University of North Carolina Code 101.3.1.2 [R] "Nonreappointment Decisions Under Section 604 of *The Code*" requires the Chancellor to respond to the Faculty Grievance Hearing Committee report. Section II.E of 101.3.1.2 [R] states that the Chancellor's decision should be based on "a thorough review of (1) the record evidence from the hearing, and (2) the recommendation of the faculty committee." According to the Code, the Chancellor should give "appropriate deference to the advice of the faculty committee." If she does not accept the Committee's recommendation, she should first indicate to the Committee her intention to reject in writing or in person. The Faculty Grievance Hearing Committee is then given the opportunity to respond to the Chancellor before she makes her final decision. [Exhibit "C" University of North Carolina Code 101.3.1.2 [R].

20. In violation of the University of North Carolina Code, Provost Norris, not Chancellor Everts, responded to the Faculty Grievance Hearing Committee's report and rejected its recommendations.

21. Plaintiff appealed the Provost's decision to Chancellor Everts, who rejected it. The Chancellor's decision deviated from the procedural requirements of the University of North Carolina Code on numerous points. One, she did not indicate her intentions to reject the recommendations of the Faculty Grievance Hearing Committee or give the Committee a chance to rebut her rationales for rejection. Two, she did not exclude the Provost's improper response to the Faculty Grievance Hearing Committee from her review process. Three, she applied the wrong standard of review in her response to Plaintiff's appeal.

22. Chancellor Evert's decision failed to give "appropriate deference to the advice of the faculty committee" and did not seriously engage with its findings. First, she rejected the Faculty Grievance Hearing Committee's finding of personal malice by Chair Smith but failed to provide countervailing evidence. She claimed that Chair Smith's memo was "proof of a lack of malice" even though the Faculty Grievance Hearing Committee considered it central to their determination of personal malice. Second, she did not rebut the Faculty Grievance Hearing Committee's finding of material procedural errors by Dean Specht. Instead, she ignored Dean Specht's procedural errors, and among other things, refused to even consider Dean Specht's improper and false claim of academic fraud.

23. Chancellor Evert's decision to reject the recommendation of the Faculty Grievance Hearing Committee also contained erroneous information. She asserted that Faculty Grievance Hearing Committee had corroborated concerns about Plaintiff's teaching and service because it reported the "independent" assessment of "two external reviewers" who were "ambivalent" about Plaintiff's qualifications. These two individuals were associate deans who reported to Dean Specht and were neither external nor independent. In fact, the three truly independent and external academic reviewers of Plaintiff's dossier were strongly enthusiastic about Plaintiff's qualifications.

24. Plaintiff appealed the Chancellor's decision to the Board of Trustees. Under the Board's bylaws, when designating an Appeals Subcommittee, the Board of Trustees must consult the Chair of Faculty Senate. Even after the Chair of Faculty Senate requested to participate in this process, he was not consulted.

25. Some members of the Board of Trustees did not receive or review the work of the Appeals Subcommittee regarding Plaintiff's appeal. Yet the Board of Trustees voted to uphold the decision of the Appeals Subcommittee and reaffirm the Chancellor's decision.

## FIRST CAUSE OF ACTION
## PETITION FOR JUDICIAL REVIEW.

**§ 150B-43. Right to judicial review.**

26. Any party or person aggrieved by the final decision in a contested case, and who has exhausted all administrative remedies made available to the party or person aggrieved by statute or agency rule, is entitled to judicial review of the decision under this Article, unless adequate procedure for judicial review is provided by another statute, in which case the review shall be under such other statute. Nothing in this Chapter shall prevent any party or person aggrieved from invoking any judicial remedy available to the party or person aggrieved under the law to test the validity of any administrative action not made reviewable under this Article. A party or person aggrieved shall not be required to petition an agency for rule making or to seek or obtain a declaratory ruling before obtaining judicial review of a final decision or order made pursuant to G.S. 150B-34. (1973, c. 1331, s. 1; 1985, c. 746, s. 1; 2011-398, s. 22; 2012-194, s. 62.1; 2019-140, s. 2(b).)

27. Plaintiff-Petitioner, Eric Karchmer, petitions for judicial review of the decision of the Board of Trustees of Appalachian State University pursuant to G.S. 150B-43.

28. Plaintiff has now exhausted his administrative remedies.

29. Based on the whole record, the decision of the Chancellor and Board of Trustees is arbitrary, capricious, erroneous and the result of repeated failures to use proper procedures required by law.

30. In the administrative process, including review by the Chancellor and the Board of Trustees, Plaintiff failed to receive fair and impartial hearings as required by the State and United States Constitution.

31. The University failed to provide Plaintiff an unbiased and impartial decision maker as required by the due process provisions of the State and U.S. Constitution. Plaintiff's application for promotion and tenure was not afforded due process because of the personal malice of Chair Smith and numerous material procedural errors, which occurred at all levels of administrative review.

## SECOND CAUSE OF ACTION
## DENIAL OF DUE PROCESS

32. Plaintiff re-alleges and incorporates all the preceding allegations one through thirty-one as if fully set forth herein.

33. Plaintiff asserts that both the original administrative review of Plaintiff's application for promotion and tenure and the subsequent grievance process materially deviated from the requirements of the Appalachian State University Faculty Handbook and University of North Carolina Code. Errors and violations occurred at almost every level of review.

34. Plaintiff asserts that the Provost and Chancellor took no action to remedy the Chair Smith's personal malice and the Dean Specht's clear violations of the promotion and tenure review process, despite the findings of the Faculty Grievance Hearing Committee.

35. Plaintiff was denied a neutral forum in which to contest the false charge of academic fraud as guaranteed in the Appalachian State University Faculty Handbook.

36. Plaintiff asserts that he was denied the opportunity to cross-examine the Chair and Dean, the Respondents in the Faculty Grievance Hearing Committee procedure.

37. The Provost and Chancellor failed to follow the proper procedure with regards to the work of the Faculty Grievance Hearing Committee. They did not seriously engage with its findings and recommendations.

38. The Board of Trustees both did not provide proper review of Plaintiff's appeal and did not follow its own bylaws, resulting in the denial of Plaintiff's promotion and tenure.

**WHEREFORE**, Plaintiff prays for the following relief:

1. That a judgment be entered in favor of Plaintiff against Defendants;

2. That Defendant Appalachian State University be ordered to reinstate Plaintiff to his position in the Anthropology Department with a promotion to associate professor;

3. That Defendant Appalachian State University be ordered to pay Plaintiff's back pay and benefits;

4. That attorneys' fees and costs be taxed against Defendants, as allowed by law;

5. That Plaintiff be promoted and granted tenure by Defendant; and

6. Plaintiff demands a jury trial in this matter.

This the 6th day of December, 2022.

_____
Bruce L. Kaplan, Attorney for Plaintiff
N.C. Bar No. 9900
P.O. Box 455
Boone, NC 28607
(828)264-7652

EXHIBIT "A"

Pages 1 - 5

## 3.6 Integrity in Scholarship and Scientific Research

### 3.6.1 Introduction

Integrity in research is the basis for the academic search for knowledge. Persons involved in academic research must guard the truth and protect the public trust that research in an academic environment has long held. Activities that interfere with an honest search for the truth cannot be tolerated in a university setting. All effort must be made to maintain an open and honest search for truth through continual commitment by faculty, staff, and students to scrupulous honesty and integrity in research.

It is clear that scientific and scholarly misconduct cannot be prevented completely by a university policy or federal law; it can only be avoided through each individual's firm commitment to academic ideals and honesty. The importance of such honesty in one's research work should be impressed upon all members of the university community by those responsible for conducting or directing research and scholarship projects. Only in this way can the university community effectively guard the truth and maintain traditions of intellectual honesty.

Appalachian State University *Faculty Handbook* • rev July 23, 2019   26

### 3.6.2 Policy Statement

In the belief that honesty and integrity are essential to the search for knowledge, it is the policy of Appalachian State University that all persons involved in research and scholarship must guard the truth, uphold the highest standards in their research and scholarship, and protect the public trust that the academic environment has long held. Whenever any Appalachian faculty member, graduate student, or other research employee is accused of serious misconduct in scientific or scholarly research, the University will conduct an inquiry, make a determination concerning the truth or falsity of the allegations, and take appropriate disciplinary action. The process of inquiry will be expeditious and protect the rights of all those concerned, including the complainant and the accused.

### 3.6.3 Definition of Research Misconduct

Since the search for knowledge is impeded and subverted by the misrepresentation of facts, openness and honesty are commonly accepted norms within the scientific and scholarly community for proposing, conducting, or reporting research. "Research misconduct" means plagiarism, falsification, fabrication of data, or other forms of deliberate misrepresentation. It does not include honest error or honest differences in interpretations or judgments of data.

### 3.6.4 Initiation of Inquiry

Allegations of research misconduct involving faculty members, graduate students, or staff should be directed to the Vice Provost for Research. The vice provost will confidentially counsel any individual who comes forward with an allegation of research misconduct since some concerns or allegations may not fall within the scope of policies and procedures developed to address research misconduct. If the vice provost determines that the concern is properly addressed through policies and procedures designed to deal with misconduct in research, these procedures should be discussed with the individual questioning the integrity of a research project. If the individual

chooses not to make a formal allegation, but the vice provost believes there is sufficient cause to warrant the inquiry, the matter should be pursued without a complainant and the vice provost should so inform the provost and executive vice chancellor.

When the subject of the inquiry is a graduate student, the case will be reviewed by the Vice Provost for Research, and the policies and procedures prescribed in the Appalachian State University Code of Academic Integrity for students will apply in the resolution of pending charges. Should the subject of the inquiry be faculty or other staff members, the vice provost in consultation with the provost and executive vice chancellor will determine whether an inquiry is warranted.

### 3.6.5 Inquiry

During the inquiry, confidentiality will be maintained to protect the rights of all parties involved. Respondent(s) may be accompanied by an observer of their choosing on three working days' written notice to the committee. If the respondent(s) chooses an observer(s), the committee may be accompanied by an observer of its choosing. Unless otherwise agreed, observers may not take part in the discussion between the respondent(s) and the committee. Observers may not be present as attorney for either party. Because confidential personnel file information may be discussed at the inquiry, the respondent(s) and any observers must sign an Observer Waiver. This document includes the respondent(s) authorization of the observer(s) to hear such confidential information, and commits the observer(s) to maintain the confidentiality of such information unless the respondent subsequently authorizes disclosure. It may be desirable to keep the identity of the complainant confidential during the inquiry phase. The Vice Provost for Research will assume

Appalachian State University *Faculty Handbook* • rev July 23, 2019 27

responsibility for disseminating information relevant to the inquiry to the appropriate individuals. Normally, this will be in writing with copies filed in the Office of the Provost.

At the interview, on three working days' written notice to the committee, the respondent(s) may be accompanied by an observer of their choosing. If the respondent chooses an observer, the committee may be accompanied by an observer of its choosing. Unless otherwise agreed, observers may not take part in the discussion between the respondent(s) and the committee. Observers may not be present as attorney for either party. Because confidential personnel file information may be discussed at the interview, the respondent and any observers must sign an Observer Waiver. This document includes the respondent's authorization of the observer(s) to hear such confidential information, and commits the observer(s) to maintain the confidentiality of such information unless the respondent subsequently authorizes disclosure.

Completion of the inquiry is marked by the determination of whether or not an investigation is warranted. The inquiry committee will provide the Vice Provost for Research a written report that summarizes the process and states the conclusion of the inquiry. This report will be delivered within sixty (60) calendar days from the inquiry committee's receipt of an allegation. The respondent will be informed whether or not there will be further investigation and, if there is a complainant, he or she will also be informed.

Allegations found to require investigation will be forwarded promptly to the investigative body; if federal funding is involved, the agency sponsoring the research will be notified at this point.

If an allegation is found to be unsupported but has been submitted in good faith, no further formal action, other than informing all involved parties, will be taken. The proceedings of an inquiry, including the identity of the respondent, will be held in strict confidence to protect the parties involved. Documentation of each inquiry shall be maintained by the Vice Provost for Research for a period of three (3) years from the date of the report. To the extent required by federal law, copies shall be provided to authorized personnel of federal agencies sponsoring research upon request. If confidentiality is breached, the institution will take steps to minimize the damage to reputations that may result from inaccurate reports. Allegations that have not been brought in good faith will lead to disciplinary action. The institution will seek to protect the complainant against retaliation; individuals engaging in acts of retaliation or breaching confidentiality will be disciplined.

### 3.6.6 Investigation

An investigation will be initiated within 30 calendar days after an inquiry concludes that such is warranted. The purpose is to further explore the allegations and determine whether misconduct has been committed and, if so, the degree of its seriousness. In the course of an investigation, additional information may emerge that justifies broadening the scope of the investigation beyond the initial allegations. The respondent will be informed when significant new directions of investigation are undertaken. The investigation will focus on accusations of research misconduct as defined previously and examine the factual materials of each case.

### 3.6.7 Structure

To carry out the investigation, the Vice Provost for Research will form an investigative committee by expanding the inquiry committee to include two additional tenured faculty and at least one representative from outside the University. In selecting the members of the committee, conflicts of interest must again be examined scrupulously and any relationship with parties to the matter must

Appalachian State University *Faculty Handbook* • rev July 23, 2019  28

be fully disclosed. Those inquiring into the allegations will be selected in full awareness of the closeness of their professional or personal affiliation with the complainant or the respondent. It is also important that the committee have appropriate expertise to assure a sound knowledge base from which to work.

### 3.6.8 Process

Upon receipt of inquiry findings that an investigation is warranted, the Vice Provost for Research will initiate an investigation promptly (ordinarily, within 30 days) and the complainant and respondent will be notified of the investigation. In accordance with federal regulations, all agencies sponsoring a research project in which misconduct is suspected will be notified immediately upon the decision to undertake an investigation. All involved parties will be interviewed and are obligated to cooperate with the proceedings in providing information relating to the case. All necessary information will be provided to the respondent in a timely manner to facilitate the preparation of a response.

If the nature of the allegations is such that there may be need to protect the health and safety of research subjects, or the interests of students and colleagues, or to protect federal funds and ensure that the purposes of federal financial assistance are being carried out, the Vice Provost for Research

may take interim administrative action to restrict or suspend the activities of the respondent, but care should be taken to safeguard the rights of the respondent.

Investigations normally will be completed within sixty (60) days of initiation. If factors such as the volume and nature of the research to be reviewed and the degree of cooperation being offered by the subject of the investigation prevent completion within sixty (60) days, an interim report describing the investigation up to that point and its expected outcome, and requesting an extension, will be filed with the Vice Provost for Research at the end of sixty (60) days. Any reasonable indication of possible criminal violations shall be reported to the Office of Research Integrity, Public Health Service, or other appropriate federal agency, within 24 hours after receipt of such information by the Vice Provost for Research. Such information also shall be forwarded through appropriate channels to the chancellor. In addition, the vice provost shall promptly inform the Office of Research Integrity or other appropriate federal agency of any facts discovered during the course of the investigation that may affect then current or potential federal funding for the individual(s) under investigation or that such agency needs to know to ensure appropriate use of federal funds or otherwise protect the public interest.

### 3.6.9 Findings

A report which thoroughly documents the investigative process and the findings of the investigative committee will be submitted in writing to the Vice Provost for Research. The respondent will receive the full report of the investigation, as will the dean of the respondent's college. When there is more than one respondent, each shall receive all those parts of the findings that are pertinent to his or her role. Respondents may comment in writing on the report and their comments will be made part of the record. The vice provost shall forward a copy of the report to all federal agencies initially informed of the investigation. Documentation of each investigation shall be maintained by the vice provost in a confidential and secure file for a period of at least three (3) years from the date the investigative committee's report is delivered to the Public Health Service or other appropriate federal agencies.

Appalachian State University *Faculty Handbook* • rev July 23, 2019 29

Investigations into allegations of research misconduct may result in various outcomes, including (1) a finding of clear, serious, and substantial research misconduct; (2) a finding of research misconduct of a minor or questionable nature; (3) a finding that no culpable conduct was committed, but serious scientific errors were made; (4) a finding that no research misconduct or serious scientific error was committed. If a finding of serious scientific misconduct is made, all agencies funding that research will be informed to the extent required by federal law. Examples of severe research misconduct include fabrication of data, plagiarism, including the publication of research or scholarship produced by another person, and falsification of vita items in order to advance one's research.

If an investigation has been launched on the basis of a complaint, and no research misconduct is found, no disciplinary measures will be taken against the complainant and every effort will be made to prevent retaliatory action against the complainant if the allegations, however incorrect, are found to have been made in good faith. If the allegations are found to have been maliciously motivated, disciplinary actions will be taken against those responsible.

### 3.6.10 Disposition

The nature and severity of the disciplinary action by the University will vary with the findings of the investigative committee. At this point, the Vice Provost for Research will inform the chancellor, provost and executive vice chancellor, and dean of the respondent's college of the investigative committee's findings. Disciplinary action shall be taken in accordance with appropriate respective policies and procedures applicable to each respondent's classification. Should the respondent(s) be found guilty of research misconduct of a clear, serious, and substantial nature, he/she/they may be considered unfit to continue as employees or students of Appalachian State University.

Respondents found guilty of research misconduct of a less clear, serious, or substantial nature may receive sanctions ranging from letters of reprimand to probation, permanent removal from the research project involved and/or other sanctions deemed appropriate under the circumstances. Findings of scientific misconduct may also warrant the removal of a faculty respondent from graduate advisory committees or other research supervisory roles.

### 3.6.11 Appeal

Respondents may appeal disciplinary actions in accordance with respective policies and procedures applicable to each respondent's classification.

### 3.6.12 Publication

Copies of this policy shall be transmitted to all faculty and academic administrators or otherwise published at least annually.

Screen Shot 2022-11-21 at 1.03.52 AM - FH 2019 (3.7.3) - tenure - ...    file:///C:/Users/BruceDesktop/Downloads/FH%202019%20(3.7.3)...

1 of 1

EXHIBIT "B"

**3.7.2** The Faculty Handbook criteria for the conferral of tenure shall be the basis for each academic department's criteria for conferral of tenure, and both Faculty Handbook and departmental criteria shall be considered in all tenure decisions. Departmental criteria may be more rigorous than Faculty Handbook criteria.

The conferral of tenure requires:

(a) an assessment of the faculty member's demonstrated professional competence;

(b) potential for future contributions;

(c) commitment to effective teaching, research, and public service; and

(d) the needs and resources of the institution.

**3.7.3** A decision not to grant tenure may not be based upon (1) the faculty member's exercise of rights guaranteed by either the First Amendment to the United States Constitution or Article I of the North Carolina Constitution, (2) unlawful discrimination based upon the faculty member's race, color, national origin, religion, sex, gender identity and expression, political affiliation, age, disability, veteran status, genetic information or sexual orientation; or (3) personal malice. For purposes of this section, the term "personal malice" means dislike, animosity, ill will, or hatred based on personal characteristics, traits or circumstances of an individual that are not relevant to valid University decision making. See UNC Policy 101.3.1 II.B. (4.6.1)

EXHIBIT "B"

EXHIBIT "C"

Pages 1 - 5

The UNC Policy Manual
101.3.1.2[R]
Adopted 07/01/19

**Regulation on Review of Nonreappointment Decisions
Under Section 604 of *The Code***

I.    The Purpose of the Review Process under Section 604 of *The Code*

    A.    Within the University, important faculty personnel decisions are based on evaluations of performance rendered by a candidate's colleagues and supervisors, who are in the best position to make such judgments. These assessments are not the product of mechanically applied checklists, criteria, or formulas; there is no simple litmus test for outstanding job performance. Rather, these decisions must reflect careful exercises of discretion, in which the faculty colleagues draw on their own academic knowledge, experience, and perceptions to evaluate the candidate's qualifications and performance. The academic review process seeks to obtain the collective good faith professional academic judgment of the candidate's colleagues and responsible university administrators, as the basis for personnel decisions. These decisions are entitled to great deference and weight and, as such, must be based on considerations that are relevant to the candidate's performance and potential to contribute to the good of the institution.

    B.    The purpose of reviewing decisions not to reappoint is to determine whether the decision was materially flawed, in violation of applicable laws, policies, standards, or procedures. A review is not to second-guess professional judgments based on permissible considerations. The purpose of the campus-based review process in Section 604 C(1) of *The Code* is to determine (1) whether the decision was based on considerations that *The Code* provides are impermissible; and (2) whether the procedures followed to reach the decision materially deviated from prescribed procedures such that doubt is cast on the integrity of the decision not to reappoint.

    C.    The purpose of appellate review by the board of trustees is to determine whether (1) the campus-based process for making the decision was materially flawed, so as to raise questions about whether the faculty member's contentions were fairly and reliably considered; (2) the result reached by the chancellor was clearly erroneous; and/or (3) the decision was contrary to controlling law or policy.

II.    Nonreappointment Decisions Under Section 604 of *The Code*

    A.    Basis for Review. A decision not to reappoint a faculty member may be made for any reason that is not an impermissible reason. The three impermissible reasons for a decision not to reappoint a faculty member, as stated in Section 604 B of *The Code*, are: (1) the exercise by the faculty member of rights guaranteed by the First Amendment to the United States Constitution, or by Article I of the North Carolina Constitution; (2) forms of discrimination prohibited under policies adopted by the University; or (3) personal malice. A faculty member who asserts that the decision not to reappoint was based on impermissible reasons may file a request for review from that decision in accordance with the procedure established by the constituent institution.

Page 1

UNC Code 101.3.1.2[R] (101.3.1.2[R].docx;1)-1.pdf          file:///C:/Users/BruceDesktop/Downloads/UNC%20Code%201.3....

11/21/22, 1:14 AM                                             101.3.1.2[R] (101.3.1.2[R].docx;1)

B.   Definition of "Personal Malice." As used in *The Code*, the term "personal malice" means dislike, animosity, ill-will or hatred based on personal characteristics, traits or circumstances of an individual that are not relevant to valid University decision making. However, a faculty member's inability or incapacity to relate constructively to his or her peers, in a necessarily collegial environment, may warrant a decision not to reappoint. Disposition of such a case requires a determination as to whether the faculty member's lack of collegiality or other attitudinal considerations impeded the faculty member's job performance. While the terms "ill-will," "dislike," "hatred," and "malevolence" may connote different degrees of antipathy, such distinctions make no difference in applying the fundamental rationale of the prohibition. Any significant degree of negative feeling toward a candidate based on irrelevant personal factors is an improper basis for making decisions.

C.   Role of the Faculty Committee. The primary role of a faculty committee is to provide, through the established campus process, the opportunity for a formal hearing to review the decision not to reappoint. Such faculty committees provide an opportunity for both parties to present relevant evidence and provide a recommendation to the chancellor on the merits of the faculty member's contentions. The faculty committee creates a clear, permanent record of the evidence presented at the hearing and advises the chancellor whether or not the faculty member has demonstrated, by a preponderance of the evidence, that the decision not to reappoint was materially flawed or was based in significant part on an impermissible reason. The faculty member has the burden of proof. The faculty committee does not have authority to render a decision or any part of a decision. The chancellor has the authority to render the final decision.

  1.   Training. Because hearings in matters of non-reappointment can present complex and difficult questions of fact, policy, and law, and because of the central role of the faculty committee hearing in gathering and preserving the evidence upon which decisions related to the matter will be based, chancellors, in consultation with campus counsel, should ensure that faculty committee members have access to appropriate training materials and that relevant administrators and aggrieved faculty members have access to information regarding the hearing process.

  2.   Election Procedures. The faculty council or senate of each constituent institution should consider whether to establish election procedures for the faculty committee so as to extend the length of service of appropriately trained committee chairs in order to make it more likely that each hearing has an experienced member to oversee a faculty committee. Election procedures may permit the establishment of a pool of trained faculty from which hearing committee members and a chair may be drawn for each hearing.

  3.   Counsel. Each constituent institution must decide whether to allow faculty members to have the assistance of an attorney or other advisor at the hearing and, if so, whether the advisor is permitted actively to participate in the hearing. Constituent institutions are discouraged from allowing attorneys to participate during the hearing. If, however, an attorney will be permitted to participate during the hearing on behalf of the faculty member, then the campus should provide legal counsel for the respondent administrator. Legal counsel for the respondent administrator may be provided by in-house campus counsel, counsel from another constituent institution, a member of the Attorney General's Office, or outside counsel.

Page 2

D. Preservation of Evidence. It is essential that all testimony and other evidence received by a faculty committee be preserved for review by the parties to the proceeding, the chancellor, and, if applicable, the board of trustees. Both the chancellor, in making the final decision, and the board of trustees in reviewing any appeal, must have access to a complete record of the evidence received at the hearing. The chancellor is responsible for determining whether the competent evidence in the record supports the faculty committee's recommendation. Similarly, the board of trustees, when considering an appeal from a chancellor's decision, must be able to determine whether the competent evidence in the record supports the chancellor's decision.

A professional court reporter, or a similarly reliable means, should be used to enable the production of a verbatim written transcript of the hearing and properly to maintain a record of the documents received by the faculty committee. Any such record shall be considered part of the faculty member's personnel file and is confidential. Access to such materials is only allowable as provided by law.

E. The Chancellor's Decision. The chancellor must base his or her decision on a thorough review of (1) the record evidence from the hearing, and (2) the recommendation of the faculty committee. While the chancellor should give appropriate deference to the advice of the faculty committee, the final decision is the chancellor's. If the chancellor is considering taking an action that is inconsistent with the recommendation of the hearing committee, the chancellor should consult with the hearing committee, either in person or in writing, before making a decision. The chancellor shall notify the faculty member and relevant administrators of the chancellor's decision in writing. In addition, the notice of the decision is to be conveyed to the faculty member by a method which produces adequate evidence of delivery.

F. Notice of Appeal Rights. The chancellor's notice to the faculty member of the decision concerning the faculty member's case must inform the faculty member: (1) of the permissible grounds for appeal; (2) of the time limit within which the faculty member may file a notice of appeal through the chancellor requesting review by the board of trustees; (3) that a simple written notice of appeal with a brief statement of the basis for the appeal is all that is required within the 14-day period; and (4) that, thereafter, a detailed schedule for the submission of relevant documents will be established if such notice of appeal is received in a timely manner.

G. Time Limits for Appeal. The campus policies, faculty handbook, or other informational document which addresses procedures for review of faculty nonreappointment decisions shall indicate the time limits for appeal of such decisions.

III. Appeals to the Board of Trustees

A. Schedule. If the board determines that the faculty member has set forth appropriate grounds for an appeal, the board will notify the parties of a schedule for perfecting and processing the appeal. If the faculty member fails to comply with the schedule established for perfecting and processing the appeal, the board may extend the period for complying with the schedule for good cause shown or it may dismiss the appeal. The board of trustees will issue its decision on appeal as expeditiously as is practical.

B. Review on Appeal by the Board of Trustees. Consistent with *The Code*, deference is given to the chancellor's decision; the board of trustees will exercise jurisdiction under Section 604 C of *The Code* in a manner that assures the integrity of campus procedures.

The first step in any appeal to the board of trustees will be an evaluation of the faculty member's written grounds for appeal to determine whether the issues raised on appeal fall within one of the three grounds for appeal as set out in this regulation and Section 604 of *The Code*. If the appeal does not present issues that fall within the established grounds for appeal, the board may dismiss the appeal without further proceedings.

The three grounds for appeal to the board of trustees are as follows:

1. Material procedural error. A faculty member may allege on appeal that the hearing conducted by the responsible faculty committee or the process followed by the chancellor included a material procedural error that, but for the error, could have resulted in a different decision. The Board may review allegations that the faculty committee and/or the chancellor did not follow its own procedures and such failure materially affected the credibility, reliability and fairness of the process. A faculty member must demonstrate that, because of a material procedural error, he or she did not receive a fair hearing or fair review by the chancellor such that, but for such error, a different decision may have been reached.

2. Clearly erroneous. A faculty member may allege on appeal that the competent evidence in the record established that the decision not to reappoint was based on an impermissible reason. A clearly erroneous decision is one that a reasonable person could not have reached, based on the competent evidence in the record taken as a whole and the relevant controlling laws or policies. To demonstrate that a decision was clearly erroneous, the faculty member must show that a reasonable person could not have reached the conclusion that the chancellor reached. Such an appeal constitutes a request that the board of trustees review the entire record of evidence to determine whether a reasonable person could have arrived at the decision in question. The issue is not whether the board of trustees would have evaluated the evidence the same way and reached the same conclusion as did the faculty committee or the chancellor; rather, the question is whether the decision reached was a reasonable one, in light of the competent evidence.

3. Contrary to law or policy. A faculty member may allege on appeal that, in disposing of the request for review, controlling law or University policy was disregarded, misinterpreted, or misapplied to the facts of the case.

During its review, the board of trustees considers whether the campus-based process or decision had material procedural errors, was clearly erroneous, or was contrary to controlling law or policy.

In reviewing whether a decision was clearly erroneous, the board of trustees considers whether the evidence introduced at the hearing and reviewed by the chancellor is such that a reasonable fact finder could find the applicable burden of proof, preponderance of the evidence, was met by the faculty member. When conducting its review, the board of trustees does not reweigh the evidence, express its independent judgment on the factual issues, determine credibility of witnesses, or otherwise conduct the same review that would be conducted by the chancellor. Instead, the board of trustees views the record in the light most favorable to the judgment below and decides if the evidence in support of that decision is reasonable, credible, and of solid value, such that a reasonable fact finder could find that nonreappointment is appropriate based on a preponderance of the evidence.

Page 4

After review on appeal, the board of trustees may affirm the chancellor's decision; or, if the board finds that the campus-based process or decision had material procedural errors, was clearly erroneous, or was contrary to controlling law or policy, the board may remand the matter to the chancellor to provide for a new hearing or a supplemental review inquiry. The remedy available on appeal is never an award by the board of trustees of the conferral of tenure, reappointment or promotion.

IV. Other Matters

A. Effective Date. The requirements of this regulation shall be effective for any non-reappointment decision effective on or after July 1, 2019.

B. Relation to State Laws. The foregoing regulations as adopted by the president are meant to supplement, and do not purport to supplant or modify, those statutory enactments which may govern or relate to faculty personnel decisions.

Page 5

https://www.northcarolina.edu/apps/policy/doc.php?id=46

5/7

5 of 7

Case 5:23-cv-00003-KDB-DCK   Document 1-3   Filed 01/11/23   Page 18 of 18

12/5/2022, 7:48 AM